**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 14-cv-00184-RM-KMT

OBERMEYER HYDRO ACCESSORIES, INC. d/b/a OBERMEYER HYDRO, INC., a Delaware corporation

      Plaintiff,

v.

CSI CALENDERING, INC. d/b/a CSI CALENDERING SPECIALISTS, INC., a North Dakota corporation

      Defendant.

---

**ORDER**

---

      This matter involves a dispute between two merchants concerning the price of rubberized fabric sold and delivered from one to the other.   The purchaser, Plaintiff Obermeyer Hydro Accessories, Inc. d/b/a/ Obermeyer Hydro, Inc. ("Obermeyer"), claims that Defendant CSI Calendering, Inc. d/b/a CSI Calendering Specialists, Inc. ("CSI") overcharged Obermeyer by several hundred thousand dollars for the 178,000 pounds of rubberized fabric that Obermeyer ordered from CSI in 2012 and 2013.   Obermeyer's complaint asserts various claims against CSI that ultimately seek the return of the money Obermeyer claims to have overpaid.   CSI, in turn, filed counterclaims against Obermeyer alleging it is still owed $655,187.38 for rubberized fabric that it delivered to Obermeyer but was never paid for.   Before this Court are the parties' cross motions for summary judgment.   (ECF Nos. 47, 59.)   For the reasons explained below, CSI's motion for summary judgment is (ECF No. 47) GRANTED and Obermeyer's motion for summary

judgment (ECF No. 59) is DENIED.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial.  *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party.  *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."

*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

If a movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in her complaint, but must respond with specific facts showing a genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary judgment.   *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial.   *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted).   "Conclusory and self-serving affidavits are not sufficient." *Id*.   The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence.   Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3).   "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."   *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and citation omitted).   The Court is "not obligated to comb the record in order to make [Plaintiff's]

3

arguments for [her]."   *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall

include the specific page or statutory subsection to which reference is made."   D.C. Colo. L. Civ.

R. 7.1(e).

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts as recited below are based on adequate citations to the record which would be

admissible at trial.

### A. The Parties

CSI specializes in preparing reinforced rubber products, including specialty and industrial

fabrics.   (ECF No. 47-2, Decl. of Vineet Saxena at ¶1.)   One of the products CSI sells is

1000/4/3/ fabric ("Fabric"), and one of the services it provides is called calendering.   (*Id.*; ECF

No. 9, Compl. ¶10.)   Calendering is a process by which rubber is married to fabric – CSI uses

large rollers to apply pressure to the rubber and fabric, forcing the rubber into the gaps of the fabric

and creating rubber sheets with fabric enforcement.   (*Id.*)   Notably, when the rubber is added to

the fabric, the resulting product has a weight nearly double that of the fabric alone.   (ECF No.

57-1, H. Obermeyer Decl. at ¶ 4.)   There are two CSI employees who primarily interacted with

Obermeyer employees during the time periods relevant to this dispute:   Terry Goetz ("Mr.

Goetz") works for CSI as sales manager (ECF No. 47-4, Goetz Decl.); Vineet Saxena ("Mr.

Saxena") works for CSI's parent company, WCCO Belting, Inc., in the capacity of executive

vice-president of supply chain, but was acting as an agent on CSI's behalf at all relevant times.

(ECF No. 47-2, Saxena Decl. at ¶1.)

4

Obermeyer designs, manufactures, and sells hydropower and water-control equipment, including inflatable dams.   (ECF No. 57-1, H. Obermeyer Decl. at ¶ 1.)   To actuate its inflatable dams, Obermeyer manufactures inflatable rubber air bladders.   (*Id.* at ¶¶ 1-3.)   One of the materials Obermeyer uses in its air bladders is rubberized, or calendered, Fabric.   (*Id.* at ¶ 3.)   Obermeyer had purchased Fabric and calendaring services from CSI for several years prior to this litigation.   (ECF No. 47-2, Decl. of Vineet Saxena, at ¶1.)   Obermeyer is primarily run by three people: Henry Obermeyer ("Mr. Obermeyer") is the president of the company (ECF No. 57-1, Decl. of Henry K. Obermeyer at ¶ 1), Rob Eckman ("Mr. Eckman") holds the position of Vice President (*Id.*), and Katherine Obermeyer, Henry's wife ("Mrs. Obermeyer"), handles a range of administrative duties, including accounts receivable, account payable, payroll, rubber purchasing, logistics, safety, and field service scheduling.   (*Id.*)

**B. Events Leading up to January 10, 2013**

As early as 2010, Obermeyer purchased both Fabric and calendering services from CSI. (ECF No. 57-1, H. Obermeyer Decl. at ¶3.)   CSI did not produce the Fabric, but rather would order it from CSI's vendor in China, which order would then be shipped to CSI's warehouse in Arlington, Texas.   (ECF No. 47-4, Goetz Decl. at ¶3; ECF No. 47-2, Saxena Decl. at ¶3.)   Up to and including the year 2012, CSI generally billed Obermeyer separately for the purchase of Fabric and for the calendering of that Fabric.   (ECF No. 47-4, Goetz Decl. at ¶2; ECF No. 47-2, Saxena Decl. at ¶2; ECF No. 57-1, H. Obermeyer Decl. at ¶¶ 6, 9-12.)   Thus, Obermeyer would typically order Fabric from CSI, which CSI would in turn order from its Chinese vendor.   (ECF No. 47-4, Goetz Decl. ¶3; ECF No. 47-2, Saxena Decl. ¶3.)   Although the parties dispute the time at which

Obermeyer was obliged to pay for the Fabric, CSI generally invoiced Obermeyer for the purchase

of Fabric at some time shortly after the Fabric arrived at the Arlington warehouse.   (*Id.*)

Obermeyer would typically order calendering services separate from the purchase of the Fabric,

typically weeks or months after the Fabric was delivered to CSI's Arlington warehouse, and would

be invoiced for the calendering separately from the Fabric purchased.   (*Id.*)

    Beginning in October, 2012, various emails were exchanged between CSI and Obermeyer

representatives discussing new orders and price quotations for Fabric and calendering.

Specifically, on October 9, 2012, CSI representative Mr. Saxena emailed Mr. Obermeyer to

inquire whether Obermeyer would like to purchase any additional Fabric, stating:

> This past year we have not received any further enquiry of [Fabric] from your side.
> We held a big quantity of [Fabric] in our warehouse for a long time which is now
> exhausted.   Are you ready to place more orders? Please let me know.

(ECF No. 57-1 at 13, H. Obermeyer Decl. Ex. 1, Oct. – Nov., 2012 email chain.)   Mr. Obermeyer

responded to this email explaining that it had placed the Fabric into its own product line and

confirming that it wished to continue acquiring Fabric from CSI.   (*Id.*)   Mr. Obermeyer also

inquired in that email about the "lead time" required for making further acquisitions.   (*Id.*)   In a

follow-up email, also on October 9, 2012, Mr. Obermeyer expressed his desire to make new

purchases of Fabric in the next 90 days and asked CSI to "get the best available price" from CSI's

supplier.   (*Id.* at 12.)

    On October 10, 2012, and in response to Obermeyer's request to obtain the best available

price from CSI's vendor, Mr. Saxena responded with an email containing quotes for Fabric,

without calendering, at $3.74 per pound and stated that this quote was "valid till December end."

6

(*Id.*)    Also on October 10, 2012, in response to this price quotation, Mr. Obermeyer emailed Mr. Saxena inquiring about the use of a pricing structure whereby Obermeyer would be billed both for Fabric and the calendering of that Fabric at the same time that the finished product was shipped to Obermeyer, asking: "Would CSI Calendering make the bilk [sic] purchase, with Obermeyer Hydro purchasing from CSI Calendering on an order-by-order of skimmed material basis."   (ECF No. 57-1 at 16, H. Obermeyer Decl. Ex. 3, Oct. 10, 2012 email chain.)   Mr. Saxena responded to this email the same day, October 10, 2012 explaining their usual billing practices, stating, among other things, that Fabric would usually be invoiced to Obermeyer within 90 days of CSI's receipt of that Fabric at its warehouse.   (*Id.*)

Essentially, Obermeyer's request for simultaneous billing of Fabric and calendering meant that CSI would make bulk purchases of Fabric from CSI's vendor, hold them in inventory at the Arlington warehouse, and then bill Obermeyer, at a later date and in a single invoice, for both Fabric and calendering as the Fabric was "skimmed [calendered] and shipped" to Obermeyer. (ECF No. 57-1, H. Obermeyer Decl., at ¶11; *Id.* at 16, H. Obermeyer Decl. Ex 3, Oct. 10, 2012 email.)

According to CSI, this new billing structure would have resulted in an increased credit risk to CSI in its relationship with Obermeyer.   CSI contends that if Obermeyer decided not to order the Fabric, they were not obligated to take any of the Fabric or pay for any calendering services. (ECF No. 47-4, Goetz Decl. at ¶6.)   CSI would thus take on additional risk of late payment or non-payment, rather than hedging this risk somewhat by invoicing CSI for the Fabric as it was delivered to the Arlington warehouse but before it had been calendered and sent to Obermeyer.

(*Id.*)   This was beneficial for Obermeyer because it only had a $25,000 line of credit through the entirety of 2012 and 2013.   (ECF No. 48-1, H. Obermeyer Dep. at 87:14-88:7.)   During that time period, Obermeyer paid all bills out of cash-on-hand that accumulated through the company's cash flow.   (*Id.* at 89:5-10, 151:14-152:18.)

In a follow-up email later that same day, October 10, 2012, Mr. Obermeyer responded to Mr. Saxena stating that "[b]ased on your information below, we will review our requirements and determine when to release a P.O. [purchase order]."   (ECF No. 57-1 at 11, H. Obermeyer Decl., Ex. 1, Oct. – Nov. 2012 email chain.)   Mr. Obermeyer also requested "detailed specification for the" Fabric so that Obermeyer could "incorporate the specification into the purchase order."   (*Id.*)

As early as November 7, 2012, Obermeyer notified CSI that it would potentially enter into a project requiring 100,000 pounds of Fabric.   (*Id.* at 10; ECF No. 57-3 at 21, Gross Decl., Ex. 7, Nov., 2012 email chain.)   Obermeyer increased that estimate to as much as 176,000 pounds of Fabric on November 28, 2012.   (ECF No. 57-1 at 45, H. Obermeyer Decl., Ex. 8, Nov. 28-29, 2012 email chain.)   In connection with this project, Obermeyer and CSI exchanged a series of emails regarding "lead time" for the delivery of new Fabric from CSI's vendor to CSI's Arlington warehouse in order to meet the demands required by Obermeyer's potential client.   (ECF No. 57-1 at 8-10, H. Obermeyer Decl., Ex. 1, Oct. - Nov., 2012 email chain.)

On November 13, 2012, Mr. Obermeyer emailed Mr. Saxena stating that he "wish[ed] to order, under our Purchase Order 12-01-749, approximately 20,000 lbs . . . of [Fabric] for earliest manufacture."   (*Id.* at 6.)   This email also stated Obermeyer's expectation that it would order an additional 70,000 lbs of Fabric in the near future in connection with the same project.   (*Id.*)

8

However, this email did not contain an attached purchase order, and indeed Obermeyer did not provide CSI with the actual purchase order 12-01-749 document until December 6, 2012.   (ECF No. 47-4 at 15-16, Goetz Decl, Ex. E, Dec. 6, 2012 email.)     In response, Mr. Saxena emailed Mr. Obermeyer confirming the order and requesting that a purchase order be sent to CSI for their records.   (ECF No. 57-3 at 43, Gross Decl. Ex. 13, Nov., 2012 email chain.)   Mr. Saxena emailed Mr. Obermeyer again the next day, November 14, 2012, confirming that they had placed this order with their vendor on an expedited basis, explaining predicted turnaround times for this order to be shipped, and again requesting that Obermeyer send the actual purchase order.   (ECF No. 57-1 at 6, H. Obermeyer Decl. Ex. 1, Nov. 14, 2012 email chain.)

On November 29, 2012, Mr. Saxena emailed Mr. Obermeyer and other Obermeyer representatives providing updated delivery schedules.   (ECF No. 57-1 at 28, H. Obermeyer Decl. Ex. 5, Nov. 29, 2012 email.)   In response, Mr. Obermeyer sent an email later that day increasing the quantity Obermeyer wished to purchase under purchase order 12-01-749 "for quantity 2 approx. 20,000 lb containers of [Fabric] for shipment the third and fourth week of December," thus causing the total quantity being purchased under purchase order 12-01-749 to grow to 60,000 pounds.   (*Id.* at 27.)   However, as with the November 13, 2012 email referencing purchase order 12-01-749, this email did not contain the actual purchase Order document, and this document was not provided to CSI until December 6, 2012 (ECF No. 47-4 at 15-18, Goetz Decl. Ex. E, Dec. 6, 2012 email) and not in a form that included a price until January 10, 2013.   (ECF No. 57-3 at 54-56, Gross Decl. Ex. 15, Jan. 11, 2013 email; ECF No. 77-2, Second Goetz Decl. ¶2; ECF No. 47-4 at 18, Goetz Decl. Ex. F, Purchase Order 12-01-749.)   CSI responded to this email the same

9

day, confirming that they would be "ordering another 2x20' (40,000 lbs) immediately" from CSI's

Fabric supplier.   (ECF No. 57-1 at 27, H. Obermeyer Decl. Ex. 5, Nov. 29, 2012 email.)   CSI

documents reflect that CSI did in fact begin ordering these quantities of Fabric from their supplier

that same day.   (ECF No. 57-3 at 48-49, Gross Decl. Ex. 14, CSI Purchase Orders 2299 and

2230.)

On December 3, 2012, a quote for calendering services was emailed to Obermeyer by CSI

representative Mr. Goetz.   (ECF No. 47-4 at 5-6, Goetz Decl. Ex. A., Dec. 3, 2012 email.)   In the

email attaching the quote, CSI states that this pricing, at $2.23/lb, would be "for compound

supplied by Kardoes via CSI, calendering, cores and poly."   (*Id.*)   The quote attached to the email

stated essentially the same and further stated that Fabric was "to be invoiced separately."   (*Id.*)

On December 6, 2012, Mrs. Obermeyer emailed several CSI representatives attaching

purchase order 12-01-749 and confirming that the document had not been given to CSI previously.

(ECF No. 47-4 at 15-16, Goetz Decl. Ex. E, Dec. 6, 2012 email.)   The body of this email

acknowledges that the price is not listed on the purchase order and indicating that "[t]here may be

an e-mail with the price.   I didn't see it yet."   (*Id.*)

On January 7, 2013, CSI emailed Obermeyer that it had requested its supplier to hold on to

the locked-in prices, and stressed the need to issue the remaining purchase orders as soon as

possible.   (ECF No. 57-1 at 48, Obermeyer Decl. Ex 9, Jan 7, 2013 email.)   Regarding the

"payment terms" CSI and Obermeyer had agreed to at this point regarding the timing at which

Obermeyer would be billed, it appears from internal CSI correspondence that CSI was still of the

impression that, as of January 7, 2013, Fabric would be billed as delivered to the Arlington

warehouse.   This sentiment is reflected in an email exchange among CSI representatives Terry

Goetz, Jeff Brown and Vineet Saxena where, responding to Mr. Goetz's question regarding

"Obermeyer current payment terms for fabric," Mr. Saxena responded that "[o]ur terms with

Obermeyer for fabric sales remain the same, i.e. 30 days after withdrawal from ware house."

(ECF No. 57-3 at 18, Gross Decl. Ex. 6, Jan. 7, 2013 email chain.)

On January 8, 2013, Obermeyer emailed CSI Purchase Order 13-00-013 for 100,000

pounds of Fabric, with the unit price for the Fabric left blank.   (ECF No. 57-1 at 52-53, H.

Obermeyer Decl. Ex. 10, Jan. 8, 2013 email.)   CSI representative Saxena responded to this email

the same day, January 8, 2013 stating "I am not clear why the unit price has not been mentioned,

the unit price is # 3.74/lb."   (ECF No. 57-1 at 55, H. Obermeyer Decl. Ex. 11.)   Also, as with the

above described purchase order 12-01-749, CSI did not receive a copy of the purchase order

document including pricing information until January 10, 2013.   (ECF No. 77-2, Second Goetz

Decl. at ¶2; ECF No. 57-3 at 56, Gross Decl. Ex. 15, purchase order 13-00-013.)

On January 9, 2012, CSI emailed Obermeyer a delivery schedule for the 100,000 pounds of

Fabric purchased under purchase order 13-00-013 and also advised them that this order could be

cancelled as late as the evening of January 10, 2013, with CSI's vendor if Obermeyer's client

should fail to confirm its own order.   (ECF No. 57-1 at 57-59, Obermeyer Decl. Ex. 12, Jan, 2013

email chain.)

### C. The January 10, 2013 In-Person Meeting and Turnkey Price Quote

On the morning of January 10, 2013, CSI representatives Terry Goetz and David Todd, met

with Mr. Obermeyer and Mr. Eckman (and briefly with Mrs. Obermeyer) at Obermeyer's

manufacturing facility in Wellington, Colorado.   (ECF No. 47-3 at 5, Page Decl. Ex. D, Pl.'s

Resp. to First Req. for Admis. No. 4.; ECF No. 57-1, H. Obermeyer Decl. at ¶¶ 7-8.)   Although

the exact discussions had at this meeting are unknown, the primary issue at the January 10

in-person meeting appears to have been the delivery schedule of calendered Fabric that Obermeyer

required in order to meet its client's needs.   (ECF No. 47-4 at 2, Goetz Decl. ¶ 8; ECF No. 48-1, H.

Obermeyer Dep. at 195:9-197:6.)   The parties also discussed Obermeyer's request that CSI

change its billing practice to invoice Obermeyer after the Fabric was calendered and shipped, and

to therefore bill both Fabric and calendering in a single invoice.   (*Id.*)

Also on January 10, 2013, purchase orders # 12-01-749, 13-00-013, and 13-00-016 were

delivered to CSI by Obermeyer, although the documents themselves pre-date the time they were

actually delivered.   (ECF No. 77-2, Second Goetz Decl. at ¶ 2; *Id.* at ECF No. 47-4 at 18-22,

purchase orders.)   Purchase orders 12-01-749 and 13-00-013 list the rate at which Fabric will be

billed, $3.74/lb, but do not mention the calendering of this Fabric.   (*Id.*)   Purchase order

13-00-016 lists as its description that it is to be a "Calandering Charge," lists the quantity of Fabric

to be calendered as 178,500 lbs, but does not include a price.   (*Id.*)

The parties did not discuss pricing—i.e. the specific rates that Obermeyer would be billed

for either Fabric or the calendering of that Fabric—at the January 10 in-person meeting.   (ECF

No. 48-1, H. Obermeyer Dep. at 211:24-212:2.)   However, it appears that Mrs. Obermeyer did

have an expectation, subsequent to the January 10 meeting, that the Fabric and calendering of the

Fabric would be billed on a "one line" basis.   (ECF No. 48-3, K. Obermeyer Dep. at 134:13-20,

129:10-23.)   As stated by Mrs. Obermeyer at her deposition, which was taken in connection with

this lawsuit,

> So when Terry was there, he said they were going to put it together on one invoice. So we were going to have the fabric and the calendering on the same invoice. Then he said they were going to combine them for simplicity of accounting. . . So I expected to have one line that reflected that—all the other agreements on pricing.

(*Id*.)   Likewise, at Mr. Obermeyer's deposition taken in connection with this lawsuit, he stated similarly that "Terry said something about invoicing the fabric and the rubber together, which I assumed was going to happen anyway . . . ."   (ECF No. 48-1, H. Obermeyer Dep. at 196:6-16.)

Also on January 10, 2013, and after the January 10 in-person meeting, CSI emailed Obermeyer stating that "today is the dead drop date [sic] to confirm our fabric supplier to proceed or halt" with respect to the 100,000 pounds of Fabric purchased under purchase order 13-00-013. (ECF No. 57-1 at 57, H. Obermeyer Decl. Ex. 12, Jan., 2013 email chain.)   Obermeyer emailed CSI that same day, confirming that "[t]he project is a go," attaching an additional purchase order 13-00-019 for an additional 40,000lb of Fabric, and requesting that CSI "negotiate the earliest possible shipment date on all containers."   (*Id*. at 60.)   The attached purchase order 13-00-019 was dated January 1, 2013, listed 40,000 pounds of Fabric at a price of "$3.74/lb," and contained the notation "billable as skimmed and shipped."   (*Id*. at 65, H. Obermeyer Decl. Ex. 13, Purchase Order 13-00-019; *see also* ECF No. 47-2 at 11, Saxena Decl. Ex.C, purchase order 13-00-019.) CSI emailed Obermeyer back soon thereafter asking Mr. Obermeyer to "[p]lease clarify the meaning of 'Skimmed and shipped' which has been mentioned in the PO."   (ECF No. 57-1 at 60, H. Obermeyer Decl. Ex. 12, Jan., 2013 email chain.)   This email further clarified that CSI had "been purchasing [Fabric] and billing for them separately than the calendering charges.   I hope we are on the same page."   (*Id*.)

On January 11, 2013, CSI representative Mr. Goetz emailed Obermeyer representatives Mr. Obermeyer and Mr. Eckman explaining that 17,309 pounds of the Fabric in CSI's Arlington warehouse had already been paid for by Obermeyer and that calendering would therefore be invoiced separately as it shipped to Obermeyer.   (ECF No. 47-4 at 11, Goetz Dec. Ex. C, Jan 11, 2013 email.)   CSI's email went on to explain that "[t]he first release on P.O. # 13-00-016 will be invoiced for calendering and compound only.   Each release after will be priced at turnkey with [Fabric] included."   (*Id.*)

CSI emailed Obermeyer again on January 11, 2013, attaching a quote (the "January 11 Quote") containing pricing individually for Fabric at $3.74/lb, pricing individually for calendering at $2.23/lb, and pricing for "Turnkey Fabric, Compound & Calendering" at $5.97/lb.   (ECF No 47-4 at 9, Goetz Decl. Ex. B, Jan. 11, 2013 email.)   In the body of the email, the quote was described as the "[p]rice breakdown for PO # 13-00-016."   (*Id.*)

Although the Turnkey price quoted by CSI in the January 11 Quote appears merely to be the price for Fabric and calendering added to one another, the resulting price of calendered Fabric actually increases nearly 40% when this new price is applied.   For example, if Obermeyer were to order ten pounds of Fabric for calendering under the parties previous arrangement by which Fabric and calendering was billed separately, it would have been charged ten pounds times $3.74 for the Fabric, or $37.40. When that Fabric was calendered, its weight would essentially double, causing it to weight approximately twenty pounds.   Obermeyer would have then been charged for the resulting twenty pounds of calendered Fabric at the calendering rate of $2.23, or $44.60.   The total cost would thus be $82.   Under the new Turnkey pricing structure, the price of $5.97 per

14

pound is applied to the calendered Fabric only, which, as mentioned, would weight twenty pounds. Thus, multiplying the twenty pounds of calendered Fabric by the Turnkey price of $5.97 would result in a total charge of $119.40, or $37.40 more than if the Fabric and calendering had been billed separately.

Later in the day on January 11, 2013, Mr. Obermeyer forwarded this email containing the January 11 Quote to Mr. Eckman.   (ECF No. 47-3 at 13, Page Decl. Ex. F, Jan. 11, 2013 email chain.)   Mr. Obermeyer requested that Mr. Eckman "review the attached to make sure this matches our numbers and that the quoted price is in line with the historical billings on which your cost estimate is based."   (*Id.*)   The record contains no evidence showing that Mr. Eckman responded to this request, nor does Mr. Obermeyer recall receiving one.   (*See* ECF No. 48-1, H. Obermeyer Dep. at 220:9-221:25.)   However, at his deposition taken in connection with this lawsuit, Mr. Eckman stated that he did review the January 11 Quote but "did not pay attention to the 5.97" Turnkey price.   (ECF No. 48-2, Eckman Dep. at 81:18 – 83:23.)

### D. CSI Ships and Obermeyer Accepts Calendered Fabric over the Course of 2013

Between January 2013 and June 2013, CSI made numerous shipments of calendered Fabric to Obermeyer and further sent Obermeyer numerous associated invoices, each of which stated the weight of calendered Fabric being delivered and the Turnkey price applied to that weight.   From January 2013 through November 2013, when CSI invoices were received they were only reviewed by Mrs. Obermeyer, who was newly in charge of the accounting department.   (ECF No. 48-1, H. Obermeyer Dep. at 57:20 – 58:14, 65:3-12, 239:8-14, 241:20-242:8.)   As confirmed by Mrs. Obermeyer, she reviewed the invoices for quantity shipped and billed, but not the price charged.

(ECF No. 57-2, K. Obermeyer Decl. at ¶¶ 6-7.)   When asked whether she reviewed the invoices to confirm proper pricing, Mrs. Obermeyer acknowledged that she "definitely did not do any analysis of that issue.   I didn't understand that . . . ." (ECF No. 48-3, K. Obermeyer Dep. at 143:15-16, 143:13-144:19.)

Between February 2013 and October 2013, Obermeyer sent numerous checks in payment for the various invoices they had received from CSI.   (*See* ECF No. 47-4, Goetz Decl. Ex. O, CSI invoices and associated Obermeyer payments; ECF No. 48-1 at 40 – 87, H. Obermeyer Dep. at 243:18 – 246:15.)

 On July 5, 2013, Mrs. Obermeyer sent CSI representative Terry Goetz an additional purchase order 13-00-381 for 20,000 pounds of Fabric, including the calendering of that fabric. (ECF No. 57-1 at 80, H. Obermeyer Decl. Ex. 18, purchase order 13-00-381.)   However, the pricing listed by Obermeyer in its purchase order broke out the price for Fabric and calendering separately, as $3.74/lb and $2.23/lb respectively, as opposed to using the Turnkey pricing that CSI had billed them for previous orders.   (*Id.*)   In his deposition testimony taken in connection with lawsuit, Terry Goetz stated that he would have likely processed this purchase order at the turnkey rate, although neither party has submitted any documentation reflecting this. (ECF No. 57-3 at 40-41, Gross Decl. Ex. 12, Goetz Dep. at 160:11-162:8.)

Had CSI charged Obermeyer for Fabric and calendering separately for the 200,000 pounds of Fabric that Obermeyer ordered in 2012 and 2013, CSI's compensation for both would have totaled around $1.5 million. (ECF No. 57-3 at 13, Gross Decl. Ex. 3, Jeff Brown Dep. at 170:1-20.) With the Turnkey pricing Obermeyer was actually billed at, CSI was to be compensated a total of

16

roughly $2.1 million, or about $600,000 more than it otherwise would have been if the billing for Fabric and the calendering of that Fabric had been broken out as separate charges.   (*Id.*)

Obermeyer filed the present lawsuit on January 22, 2014 and filed an amended complaint on February 4, 2014.   (ECF No. 9.)   Obermeyer's amended complaint asserted various claims including breach of contract, promissory estoppel, money had and received, unjust enrichment, and a claim under the Texas Deceptive Trade Practices Act.   However, all of these claims were based on essentially the same facts, allege essentially the same wrongdoing, and request essentially the same damages.   (*Id.* ¶¶ 49-77.)   CSI filed its answer to Obermeyer's complaint on August 15, 2014 asserting three counterclaims, one claim for breach of contract, an alternative claim for unjust enrichment, and an additional claim for unjust enrichment based on facts unrelated the above described dealings.   (ECF No. 38 at ¶¶ 20-48.)   The parties thereafter stipulated to the dismissal of CSI's third count of unjust enrichment (ECF No. 45) and this Court granted CSI's motion to dismiss Obermeyer's claim under the Texas Deceptive Trade Practices Act.   (ECF No. 46.)   While claims still remain other than the competing breach of contract claims asserted by both parties, all of these remaining claims can be resolved through the same analysis described below.

## III.   ANALYSIS

Put simply, the parties dispute at what price they had agreed upon for the purchase and sale of calendered Fabric.   CSI argues that the parties had an agreement that, with the exception of about 20,000 pounds of Fabric that Obermeyer had already paid for, all future billing for Fabric and calendering would be combined on a single invoice and at a new Turnkey price of $5.97 per

pound.   Obermeyer agrees that the parties agreed to combine the billing of Fabric and calendering

service such that Obermeyer would be billed for both after delivery, but contends that this was not

intended to affect the price they had previously agreed to of $3.74/lb for Fabric and $2.23/lb for

calendering.   Alternatively, Obermeyer contends that it should not be forced to pay the Turnkey

rate for Fabric and calendering because CSI never explained that the Turnkey rate would result in

a higher overall price than when Fabric and calendering had been computed separately.   A

complicating aspect of these parties' agreement is that it is not contained within a single, unified

document containing all material terms.   Rather, the agreement is spread out over numerous

documents that track the evolution of the parties' negotiations and generally were created of

expediency to meet the dynamic needs of both parties as Obermeyer negotiated a large contract

with its customer and CSI negotiated with its vendor to meet the timelines demanded by

Obermeyer.   Despite the lack of any one, clear document memorializing the parties' entire

agreement, neither party argues that there was no contract entered into; they merely disagree as to

the price.

Starting from the proposition that there was a contract, the question becomes, what were

the terms of that contract? More specifically, what was the price agreed to? The parties agree that

Texas law applies.   In performing its analysis, the Court assumes that Obermeyer and CSI are

bound by the manifestations of assent as well as the knowledge of its agents in the negotiating

process.

### A. Contract Formation, Modification and Interpretation

Obermeyer contends in its motion for summary judgment that its contracts with CSI for the

18

purchase and sale of calendered Fabric was completely formed at the time that Obermeyer sent its purchase orders to CSI or, alternatively, when the receipt of those purchase orders was confirmed by CSI by email, but in either event before CSI sought to introduce the Turnkey price term. Conversely, in CSI's motion for summary judgment, it does not peg a specific time at which a final contract was formed between CSI and Obermeyer, but rather argues that Obermeyer's conduct in requesting changes to CSI's billing practices, receipt of notice from CSI of a price increase, accepting twenty-five shipments of calendered goods, and paying twenty-one invoices at Turnkey pricing without objection together operated to form a contract including Turnkey pricing. Alternatively, CSI argues that even if the parties had formed an enforceable contract prior to January 11, 2013 when the Turnkey price quote was delivered, the parties' course of conduct and performance subsequent to that date effectively modified their contract to include Turnkey pricing. As explained below, under any of these theories of when the parties' contract was formed or modified, this Court finds that Turnkey pricing was incorporated into the parties' agreement.

Under Texas common law, to establish the existence of an enforceable contract, a party must prove (1) an offer, (2) the acceptance of the offer, (3) mutual assent or a "meeting of the minds" regarding the subject matter and essential terms of the contract, and (4) consideration, or mutuality of obligations. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007); *Harco Energy, Inc. v. Re-Entry Peopel, Inc.*, 23 S.W.3d 389, 392 (Tex. App. 2000); *Excess Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 71 (Tex. 2008).   In determining whether the parties have formed a contract through offer, acceptance, and mutual assent of terms, the Court is guided to base its determination on an objective standard of what the

parties said and how they acted, not on their subjective state of mind.   *Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 589 (Tex. App. 2007); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("[T]he parties' intent is governed by what they said, not by what they intended to say but did not."); *Fuqua v. Fuqua*, 750 S.W.2d 238, 245 (Tex. App. 1988) ("The meaning reasonably conveyed by the parties' actions and words, rather than their uncommunicated subjective intentions, controls whether a contract has been formed.").

Nevertheless, as expressed in the Restatement Second of Contracts §20(1), "[t]here is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and . . . neither party knows or has reason to know the meaning attached by the other. . . ."   Under this rule, no contract is formed if the parties have a misunderstanding of the terms of the agreement and neither party is at fault or if both parties are equally at fault.   Rest. 2d Contracts, § 20, cmt. d; *see also* Rest.2d Contract, § 201.   Conversely, "[t]he manifestations of the parties are operative in accordance with the meaning attached to the parties by one of them if . . . that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party; . . . ."   Rest. 2d Contracts §20(2)(b); *see also* Rest. 2d Contracts § 201(2).   In other words, under this rule, a party may be bound by a negligent manifestation of assent, provided the other party is not negligent.   Rest. 2d Contracts §20, cmt. d.

Because this dispute concerns the exchange of "goods" (calendered Fabric) by "merchants" (CSI and Obermeyer), the Texas Uniform Commercial Code (the "UCC") governs the transactions at issue.   Tex. Bus. & Com. Code § 2.105(a).   The UCC codifies various

methods by which parties can demonstrate a meeting of the minds.   First, the UCC provides that "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."   *Id.* § 2.204(a).   The UCC further provides that "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined," *Id.* § 2.204(b), and that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."   *Id.* § 2.204(c).

    1.    Contract Formation and Interpretation

    In both its opposition to CSI's motion for summary judgment as well as Obermeyer's own motion for partial summary judgment, Obermeyer claims that the email sent by CSI to Obermeyer containing a price quote for Fabric at $3.74/lb on October 10, 2012 constituted a binding offer to sell Fabric at $3.74/lb.   Obermeyer contends that it accepted this offer on November 13, 2012, when it sent CSI an email stating that it wished to purchase 20,000 pounds of Fabric under purchase order 12-01-749.   Alternatively, Obermeyer contends this email referencing purchase order 12-01-749 would constitute an offer, and that CSI accepted this offer by acknowledging its receipt and taking actions to procure the 20,000 pounds of Fabric from its supplier and providing Obermeyer with a delivery schedule.   Tex. Bus. & Com. Code Ann. § 2.206(a)(2) (an offer to buy goods may be accepted "either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods . . . .").   Obermeyer contends that the addition of 40,000 pounds of Fabric to purchase order 12-01-749 created a binding contract under a similar analysis:

Obermeyer's order was confirmed by CSI; CSI ordered the additional Fabric from its vendor; and CSI provided Obermeyer with a delivery schedule.   Likewise, as to purchase order 13-00-013 for 100,000 pounds of Fabric, Obermeyer contends that its email containing this purchase order of January 8, 2013 operated either as an acceptance of CSI's offer to sell at $3.74/lb or constituted a new offer to purchase, which CSI confirmed by email and further indicated that the price of Fabric stood at $3.74/lb.   CSI similarly began near immediate efforts to procure this Fabric from its vendor and provided Obermeyer with a delivery schedule the following day, January 9, 2013. Obermeyer points out that an internal email among CSI employees on January 11, 2013 attaches both purchase orders as they contained the purchase price for Fabric at $3.74/lb.   (ECF No. 57-3 at 54-56, Gross Decl. Ex. 15, Jan. 11 email.)   Finally, Obermeyer contends that purchase order 13-00-019 for 40,000 pounds of Fabric either constitutes an acceptance of CSI's previous offer to sell Fabric at $3.74/lb or a new offer to purchase Fabric at $3.74/lb and, if deemed an offer, that CSI accepted by confirming its receipt and placing that order with its vendor.

Even if this Court were to assume without deciding that the October 10, 2012 price quote was a firm offer by CSI to sell Fabric at $3.74/lb and that Obermeyer's emailed purchase orders (or even references to purchase orders) acted as acceptances of that offer, thus forming a contract, the Court finds that there is no dispute of material fact that the parties' subsequent course of conduct and performance make clear that their contract included an agreement for simultaneous billing of Fabric and calendering and that such billing would be had at Turnkey pricing.[1]   The Court's

---

1 Because this Court proceeds in its analysis on the inference, as argued by Obermeyer, that the contract between Obermeyer and CSI was fully formed prior to the delivery of the Turnkey price quote on January 11, 2013, the "battle of the forms" provision codified at UCC § 2.207 would not apply to the analysis of

analysis would not differ even if it were to assume, without deciding, that Obermeyer's purchase

orders (and emails referencing those purchase orders) were offers and that CSI's confirmatory

emails were acceptances.

Whether the Court assumes that the parties' contracts were formed at the time that

Obermeyer sent each purchase order or, alternatively, at the time that CSI emailed its confirmation

of those orders, it is clear that none of the communications that would constitute those agreements

made provision for the time at which Fabric would be billed.   In an email sent by Henry

Obermeyer to CSI the same day as his receipt of the October 10, 2012 price quote, he asks whether

CSI would make the bulk purchase of Fabric that Obermeyer could "purchas[e] from [CSI] on an

order-by-order of skimmed material basis?"   (ECF No. 57-1 at 11, Obermeyer Decl. Ex. 1, Oct.,

whether Turnkey pricing was incorporated into the contract.   *Preston Farm*, 625 S.W.2d 295 (§ 2.207 did
not apply where "[t]he basic contract for sale of goods had already been formed and executed."); *Tubelite*,
819 S.W.2d at 804 (§ 2.207 did not apply where "the written offer and acceptance occurred before the forms
containing the additional term were sent.").   However, if this Court were to assume that CSI and
Obermeyer finalized their contract at some later date or even that the exact date of contracting is
inascertainable, it would still conclude that Turnkey pricing was incorporated into their agreement by
operation of UCC § 2.207.   Because the price of calendered Fabric is a material term of the agreement, the
January 11 Quote would not have been incorporated into the contract between the parties at the time it was
sent.   Tex. Bus. Com. Code § 2.207(b) (additional terms contained in written confirmations "become part
of the contract *unless . . .* they materially alter" the contract) (emphasis added).   However, the January 11
Quote would act to create a contradiction to the writings offered by Obermeyer with respect to price, such
as, for example, purchase order 13-00-019, which states the price of Fabric at $3.74/lb but also states that
the price would be "billable as skimmed and shipped."   (ECF No. 57-1 at 57, Obermeyer Decl. Ex. 12, Jan.
10, 2013 email.) Under § 2.207(c) then, the price of Fabric agreed upon the parties could not be definitively
ascertained merely by reference to "those terms on which the writings of the parties agree."   Tex. Bus.
Com. Code § 2.207(c).   However, this price is ascertainable by reference to the "supplementary terms
incorporated under" other UCC provisions.   *Id.* Specifically, this Court would then turn to UCC § 1.103
and analyze the "course of performance or course of dealing between the parties . . . in ascertaining the
meaning of the parties' agreement" and, in particular, price. Tex. Bus. Com. Code § 1.103.   As explained in
the analysis below, Obermeyer's acts of altering orders, accepting shipments, and making payments was
sufficient proof of performance to show that Turnkey pricing was incorporated into their agreement.

2012 email chain.)   Whether the purchase order emails sent by Obermeyer would constitute offers or whether the acceptance was made when CSI emailed its confirmation and acceptance of those purchase orders, it is clear that the neither of these alternatives resolved the question posed by Obermeyer of when it would be billed for the goods it purchased, whether after it was delivered to CSI's Arlington warehouse as it had been in past dealings or whether as "skimmed and shipped" as Obermeyer requested.

Particularly telling is the email exchange of January 10, 2013 relating to purchase order 13-00-019.   Purchase order 13-00-019, which was dated January 1, 2013 but provided to CSI on January 10, 2013, listed Obermeyer's order for 40,000 pounds of Fabric at a price of $3.74/lb and also contained the notation "billable as skimmed and shipped."   (ECF No. 57-1 at 60, 65, Obermeyer Decl. Exs. 12 and 13, January 10 email exchange and attached purchase order 13-00-019.)   CSI representative Vineet Saxena emailed Henry Obermeyer back minutes later confirming his receipt of the purchase order but also asking Mr. Obermeyer to "[p]lease clarify the meaning of 'Skimmed and shipped' which has been mention[ed] in the PO."   (*Id.* at 60.)   This email further clarified that CSI had "been purchasing [Fabric] and billing for them separately than the calendering charges.   I hope we are on the same page."   (*Id.*)

Although the billing timeline for Fabric and calendering was clearly still being resolved between the parties, this is not to say that the contract was not finalized and enforceable.   Indeed, the UCC allows that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."   Tex. Bus. & Com. Code Ann. § 2.204(c).   Here, it is

24

beyond peradventure that the parties did intend to make a contract, and indeed one was made, which neither party disputes.   Further, based on a review of the parties' course of dealings and performance, as explained below, this Court finds that there is a "reasonably certain basis for giving an appropriate remedy."   *Id.*   The matter is thus one of interpretation.

On the interpretation of contracts, the UCC provides that "course of performance or course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."   *Id.* § 1.303.   In transactions governed by the UCC, the parol evidence rule—the requirement that a written agreement may not be contradicted by use of evidence of any prior agreement or contemporaneous oral agreement—makes exception for evidence of "course of performance, course of dealing, or usage of trade" used to "explain[] or supplement[]" the terms of a contract.   *Id,* §§ 2.202, 1.303 ("A course of performance or course of dealing between the parties . . . may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement.").   "Course of dealing" is defined in the UCC as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."   *Id.* § 1.303(b).   Course of performance is defined as a "sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."   *Id.* §1.303(a); *see also* Rest.2d Contracts §

202(4).

In *Preston Farm*, the Texas Supreme Court held that proof of a buyer's course of dealing and performance was sufficient to support a finding that it had impliedly agreed to pay interest charges imposed in monthly statements that were sent after the sales contract was otherwise formed.   625 S.W.2d at 298-300.   The Texas Supreme Court relied on evidence that the buyer had made over twenty credit purchases from the seller over the course of a year, that the buyer had received monthly statements conspicuously imposing the interest charge, and that the buyer had paid at least some of these charges in full without objection.   *Id.* at 298-99.

Subsequently, in *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, the Texas Supreme Court distinguished *Preston Farm* in holding that a party's (Marine's) mere failure to object to another party's "unilateral act of charging interest on Marine's invoices and deducting those charges" from proceeds due Marine "are not evidence of an agreement between the parties to the . . . interest charge."   644 S.W.2d 443, 445-46 (Tex. 1983).   The court reasoned that "[t]here was no evidence of any conduct by Marine indicating its acceptance of those terms" and that, "[w]hile it is true Marine never complained of the interest charges, Marine also never paid them . . . ."   *Id.*   Later, in *Tubelite a Div. of Indal Inc. v. Risica & Sons Inc.*, the Texas Supreme Court relied on the same distinction in holding that evidence of a subcontractor's post-contract formation "acknowledgements" purporting to impose finance charges, without more, could not support a finding that the parties had impliedly agreed to modify their existing sales contracts by adding that term.   819 S.W.2d 801, 804 – 805 (Tex. 1991).   The Texas Supreme Court in *Tubelite* explained:

> ***Acquiescence to the contract by the party to be charged may be implied from his affirmative actions, such as when he continues to order and accept goods with***

26

> ***the knowledge that a service charge is being imposed and pays that charge without timely objection.***   But the mere failure to object to the unilateral charging of interest, without more, does not establish an agreement to pay interest between the parties.

*Id.* at 805 (internal citations omitted).

Here, there are numerous "affirmative actions" on the part of Obermeyer indicating its assent to Turnkey pricing.   Subsequent to its receipt of the January 11 Quote and confirmatory email stating that Obermeyer would be charged Turnkey pricing going forward, Obermeyer accepted every shipment of calendered Fabric that was delivered based on the original delivery schedule, made alterations to the delivery schedule, and altered orders.   (ECF No. 47-4 at 30-38, Goetz Decl. Exs. K-N, various emails among CSI and Obermeyer representatives.)   Between January 2013 and June 2013, CSI made numerous shipments of calendered Fabric to Obermeyer, which Obermeyer accepted.   Accompanied with these shipments were numerous separate invoices, which clearly stated both the weight of the calendered Fabric delivered as well as the unit price applied.   (ECF No. 47-4 at 40 – 87, Goetz Decl. Ex. O, CSI invoices and corresponding Obermeyer payment records.)   Between February 22, 2013 and October 11, 2013, Obermeyer sent numerous checks to CSI in payment of these invoices.   (*Id.*)

Obermeyer argues that this evidence—evidence of their course of performance—would not operate to determine the parties' understanding because Obermeyer did not have knowledge of the true nature of the Turnkey pricing until many months later.   However, Texas courts faced with similar facts have imputed knowledge to a merchant where it "knew or should have known" of the contract's terms.   *Indus. Disposal Supply Co. v. Perryman Bros. Trash Serv.*, 664 S.W.2d 756, 766 (Tex. App. 1983).   A buyer is deemed to have knowledge of a charge that is "plainly and

conspicuously stated" on monthly statements that the buyer pays without timely objection. *Preston Farm*, 625 S.W.2d at 298.   This is so because "[t]he Code assumes that transactions between professionals in a given field"—such as the representatives of CSI and Obermeyer, who have been operating in this industry for many years—"require special and clear rules which may not apply to a casual or inexperienced seller or buyer." *Id.* at 299.   "Thus, the same course of conduct which might establish a contract between merchants might be insufficient to evidence a consumer contract." *Id.*   Similarly, imputing constructive knowledge to a merchant where it is in possession of documents clearly indicating the term to be applied is consistent with the "objective standard of what the parties said and how they acted" in determining the formation of their contract.   *Texas Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 589; *Fiess*, 202 S.W.3d at 746; *Fuqua*, 750 S.W.2d at 245.   Indeed, the existence of mutual assent is determined by an objective rather than a subjective standard, i.e., what a reasonable person would believe from a contracting party's outward manifestations of assent.

In any event, the evidence submitted by the parties clearly indicates that Obermeyer did have an actual, literal understanding that the price of calendered Fabric would be changing, even if it did not understand the full ramifications of this change.   Indeed, the parties began this discussion as early as October 10, 2012, when Obermeyer inquired as to whether CSI would be willing to make bulk purchases of Fabric "with Obermeyer Hydro purchasing from CSI Calendering on an order-by-order of skimmed material basis."   (ECF No. 57-1 at 16, Obermeyer Decl. Ex. 1, Oct. 10, 2012 email chain.)   This negotiation again resurfaced at the January 10, 2013 in-person meeting when, as agreed by both parties, the topic of combining Fabric and calendering

28

onto a single invoice was discussed.    As stated by Katherine Obermeyer at her deposition, which

was taken in connection with this lawsuit, she gained an understanding from CSI representative

Terry Goetz at the January 10 in-person meeting that CSI was "going to put it together on one

invoice.   So we were going to have the fabric and the calendering on the same invoice." (ECF No.

48-3, K. Obermeyer Dep. at 134:13-20, 129:10-23.)    Likewise, at Henry Obermeyer's deposition

in connection with this lawsuit, he stated similarly that "Terry said something about invoicing the

fabric and the rubber together, which I assumed was going to happen anyway . . . ."   (ECF No.

48-1, H. Obermeyer Dep. at 196:6-16.)    This understanding was similarly reflected in the

meaning Mr. Obermeyer ascribed to the statement "billable as skimmed and shipped" written on

Purchase Order 13-00-019, which was also sent to CSI on January 10, 2013.   (ECF No. 57-1, H.

Obermeyer Decl., at ¶11; *Id.* at 65, H. Obermeyer Decl. Ex. 13, Purchase Order 13-00-019; *see*

*also* ECF No. 57-1 at 11, Obermeyer Decl. Ex. 3, October 10, 2012 email.)    Mr. Obermeyer's

stated understanding of the request written on Purchase Order 13-00-019 was that "[a]s CSI skims

it and ships it, they bill it."   (ECF No. 48-1, H. Obermeyer Dep. at 202:13-20.)

      The communications among Mr. Obermeyer, Mrs. Obermeyer, and Terry Goetz at the

January 10 in-person meeting was followed on with two emails to Obermeyer representatives the

following day, providing a quote for turnkey pricing and also explaining that turnkey pricing

would be used to charge Obermeyer for all orders except those involving the 18,500 pounds of

Fabric that Obermeyer had already paid for separately.    (ECF No. 47-4 at 8-11, Goetz Decl. Exs.

B and C, Jan. 11, 2013 emails.).    Mr. Obermeyer forwarded this email containing the turnkey

price quote to his employee, Rob Eckman, requesting that Mr. Eckman "review the attached to

make sure this matches our numbers ***and that that the quoted price is in line with the historical***

***billings on which your cost estimate is based***." (ECF No. 47-3 at 13, Page Ex. F, Jan. 11, 2013

email chain.)   Although Mr. Eckman did not perform the requested analysis using the Turnkey

price quote, this email indicates Henry Obermeyer's understanding and actual knowledge that

some analysis would need to be performed to "make sure . . . that the quoted price is in line with the

historical billings" that CSI had charged Obermeyer in the past.   (*Id.*)   As these communications

make clear, Obermeyer had knowledge and understanding that the prices previously agreed to

between Obermeyer and CSI had changed, even if it did not bother to inform itself of what result

this change would produce.

      2.   <u>Contract Modification</u>

     Even if this Court did not use the parties' course of dealings and performance to interpret

the scope of their agreement at the time it was formed, the same analysis could be used to find that

the same conduct "is sufficient to modify the terms of the agreement" to include the provision of

Turnkey pricing.   *Tubelite*, 819 S.W.2d at 804.   "Modification of a contract is some change in an

original agreement which introduces a new or different element into the details of the contract but

leaves its general purpose and effect undisturbed."   *Eserch Corp. v. Rebich*, 925 S.W.2d 75, 83

(Tex. App. 1996) (citing *Morgan v. Stover*, 511 S.W.2d 362, 364 (Tex. App. 1974)).   "To prove

modification, a party must show that the other side (1) had notice of the change and (2) accepted

the change."   *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F.Supp.2d 831, 849 (S.D. Tex.

2011); *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986).

     Regarding the modification of contracts, UCC § 2.209 applies and provides in full as

follows:

(a) An agreement modifying a contract within this chapter needs no consideration to be binding.

(b) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(c) The requirements of the statute of frauds section of this chapter (Section 2.201)[2] must be satisfied if the contract as modified is within its provisions.

(d) Although an attempt at modification or rescission does not satisfy the requirements of Subsection (b) or (c) it can operate as a waiver.

(e) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Tex. Bus. & Com. Code § 2.209. Even if this Court were to entertain Obermeyer's argument that the parties had entered into a binding contract at the time that Obermeyer submitted its purchase orders to CSI, the undisputed evidence submitted by both parties establishes that Obermeyer had notice of, and approved modifications to the parties' contract to include simultaneous invoicing of both Fabric and calendering using Turnkey pricing. As noted above, negotiations surrounding a change to CSI's billing practices emerged at least as early as October 10, 2012, when Obermeyer inquired as to whether CSI would be willing to make bulk purchases of Fabric "with Obermeyer Hydro purchasing from CSI Calendering on an order-by-order of skimmed material basis." (ECF

---

2 Here, UCC § 2.201, the UCC's statute of frauds, would be satisfied and the parties' contract "enforceable" even under a modification analysis, and even if the Court did not find a valid written document to exist, because this dispute concerns "goods for which payment has been made and accepted or which have been received and accepted . . . ." Tex. Bus. Com. Code § 2.201(c)(3).

No. 57-1 at 16, Obermeyer Decl. Ex. 1, Oct. – Nov., 2012 email chain.)   The topic was again broached at the January 10, 2013 in-person meeting—after the contract was ostensibly formed, as Obermeyer contends—where Obermeyer representatives Katherine Obermeyer and Henry Obermeyer agree that they were informed by Terry Goetz that the two charges would be combined on a single invoice and that the price for both would be rendered on a "one line" basis.   (ECF No. 48-3, K. Obermeyer Dep. at 134:13-20, 129:10-23.)   Although the exact contents of the discussions at the in-person meeting are unknown, two emails were sent the following day making clear that CSI did seek to impose Turnkey pricing on the vast majority of Fabric that Obermeyer had recently ordered, as CSI representative Terry Goetz wrote that "[t]he first release on P.O. # 13-00-016 will be invoiced for calendering and compound only.   Each release after will be priced at turnkey with [Fabric] included."   (ECF No. 47-4 at 11, Goetz Decl. Ex. C, Jan 11, 2013 email.) CSI emailed Obermeyer again on January 11, 2013, attaching the January 11 Quote which set out the Turnkey price of $5.97/lb.   (ECF No 47-4 at 8-9, Goetz Decl. Ex. B, Jan. 11, 2013 email.)   In the body of the email, the quote was described as the "[p]rice breakdown for PO # 13-00-016." (*Id.*)   As a result of these communications, which took place over the course of over three months, and directly involved the president of Obermeyer, this Court holds that Obermeyer had notice that a modification to their contract with CSI had been introduced that would have modified the timing and price at which calendered Fabric would be billed to Obermeyer.

Likewise, as described above, over the course of many months in 2013, CSI made numerous shipments of calendered Fabric to Obermeyer, which Obermeyer accepted.   CSI sent multiple invoices requesting payment for these shipments and including a price breakdown of each

shipment, which Obermeyer paid without objection.   These facts conclusively establish, as a matter of law, that the "post contract formation conduct of [CSI and Obermeyer] is sufficient to modify the terms of the agreement to include" Turnkey pricing.   *Tubelite*, 819 S.W.2d at 804.

Obermeyer argues that summary judgement cannot be granted under a theory of contract modification because a material issue of fact exists as to whether CSI acted in good faith.   The published comments to UCC § 2.209 provide that, as is required in the initial formation of the contract, "modifications . . . must meet the test of good faith imposed by this Act.   The effective use of bad faith to escape performance on the original contract terms is barred . . . ."   Tex. Bus. & Com. Code § 2.209 cmt 2.   Indeed, "[e]very contract or duty [under the UCC] imposes an obligation of good faith in its performance and enforcement."   Tex. Bus. & Com. Code § 1.304. "[T]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached."   Tex. Bus. & Com. Code § 1.304, cmt. 1.   "Good faith," as that term is defined in the UCC, "means honesty in fact and the observance of reasonable commercial standards of fair dealing."   Tex. Bus. Com. Code § 1.201(b)(20).   "Honesty in fact," as Texas courts have employed this term, involves "analyzing whether the parties were in fact motivated to seek modification by an honest desire to compensate for commercial exigencies."   *Man Indus. (India) Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 364 (Tex. App. 2013) (internal quotation and citation omitted).   Good faith is comprised of both objective and subjective components.   A party acts with objective good faith when it seeks a modification as the result of "a factor, such as increased costs, which would cause

33

an ordinary merchant to seek a modification of the contract." *Id.* at 366.   A party acts in subjective bad faith when a modification is the product of coercive, extortive or fraudulent conduct.  *Id.* at 367.

Here, Obermeyer has presented no evidence that would create a material issue of fact as to whether CSI failed to "observ[e] . . . reasonable commercial standards of fair dealing," Tex. Bus. & Com. Code §1.201(b)(2), nor has it presented evidence creating a material issue of fact as to whether CSI was not "motivated to seek modification by an honest desire to compensate for commercial exigencies." *Man Indus. (India) Ltd.*, 407 S.W.3d at 364.   Essentially, Obermeyer contends that CSI's lack of good faith is determined by resolving the issue of "whether a vendor can act in good faith when it increases prices by over 40% without telling its customer about the increase," and Obermeyer contends that the answer to this question is no.   (ECF No. 82 at 14.) However, this assertion is based on a faulty premise: that CSI did not tell Obermeyer that the price of calendered Fabric would change.   As described above, negotiations regarding how calendered Fabric would be billed began as early as October 10, 2012 and directly involved Henry Obermeyer, the president of Obermeyer.   Before any of the calendered Fabric at issue in this litigation was ever delivered to Obermeyer, a quote including Turnkey pricing was sent to Obermeyer and an additional email was further sent explaining that Turnkey pricing would be applied to future calendered Fabric deliveries except for a small portion of Fabric that Obermeyer had already paid for.   Even after CSI began its performance and shipped the calendered Fabric to Obermeyer, it provided Obermeyer with numerous invoices specifically indicating that Obermeyer had been charged at Turnkey pricing for the goods they had accepted.

Obermeyer has not pointed to any case law, nor has this Court found any upon its own review, that would require a vendor such as CSI to go further than it did to explain to its customer—a merchant that has operated in this industry for many years and is well versed in the product being purchased—the meaning of its prices and affirmatively ensure that it had a complete understanding of those prices prior to performing on the contract.

3.     Negligent Assent

Furthermore, even if the Court concluded that the Turnkey pricing as it was relayed in the January 10 quote was so ambiguous that either party's intended meaning reasonably can be derived from the language used, the contract should nevertheless be enforced according to the meaning asserted by CSI.   The guiding principle in this situation is that articulated in Restatement Second of Contracts §20(2).   "The manifestations of the parties are operative in accordance with the meaning attached to them *by one of the parties* if . . . that party has no reason to know of any different meaning attached by the other, and *the other has reason to know* the meaning attached by the first party."   Rest. 2d Contracts § 20(2) (emphasis added) (*see also Id.* §201(2) and cmt. d.) This rule acknowledges that while some contracts are integrated into a single document, in many cases "agreement may be found in a jumble of letters, telegrams, acts and spoken words" and that in either case "the parties may have different understandings, intentions and meanings."   *Id.* §20, cmt. c.   This rule applies to these situations such that a party may be bound by a negligent manifestation of assent if the other party is not negligent.   *Id.* cmt. d.

Here, the documentary evidence submitted by both parties shows that Obermeyer had "reason to know" the meaning intended by CSI.   As noted above, upon receiving the January 11

35

Quote, Henry Obermeyer reviewed the quote but "didn't pay any attention to what might have been measured for the 5.97 or what—what it meant . . . ."   ECF No. 48-1, H. Obermeyer Dep. at 211:11-212:2.)   Further, Mr. Obermeyer also forwarded the quote to Rob Eckman requesting that he "review the attached to make sure this matches our numbers and that the quoted price is in line with the historical billings on which your cost estimate is based."   (ECF No. 47-3 at 13, Jan. 11, 2013 email chain.)   However, Mr. Eckman "did not pay attention to the 5.97" Turnkey price upon his review of the Turnkey price quote.   (ECF No. 48-2, Eckman Dep. at 81:18 – 83:23.)   Likewise, in both Mr. Eckman's and Mr. Obermeyer's depositions, each agreed that, had they personally reviewed the invoices that CSI had been sending Obermeyer for calendered Fabric, they would have determined that the prices listed in those invoices did not align with their expectations.   (ECF No. 48-1, H. Obermeyer Dep. at 242:9-14, 242:19 – 243:17, 240:3 – 241:4, 258:1-259:21; ECF No. 48-2, Eckman Dep. at 93:1-22.)   When asked at her deposition whether she had analyzed the overall prices that Obermeyer would pay for calendered Fabric using the Turnkey pricing structure, Mrs. Obermeyer stated that she "definitely did not do any analysis of that issue.   I didn't understand that.   And at that time I trusted the people at CSI."   (ECF No. 57-3 at 26, Gross Decl. Ex. 8, K. Obermeyer Dep. at 143:13 - 17.)

The next question is whether CSI had reason to know the meaning attached to the Turnkey price quote and subsequent communications by Obermeyer.   As the parties both agree, however, Obermeyer did not object to the Turnkey pricing structure until November, 2013, when it refused to pay all outstanding invoices.   (*See* ECF No. 48-1, H. Obermeyer Dep. at 246:23-247:10.)

Because Obermeyer had numerous opportunities to gain an understanding of the meaning

and ramifications of the Turnkey pricing that CSI applied to their agreement, yet failed to do so, and because CSI had no reason to know that Obermeyer had failed to gain this understanding, this Court holds that it should interpret the parties agreement according to the meaning ascribed to it by CSI.

### B. Quasi-Estoppel

CSI also argues that Obermeyer should be estoped from seeking to be charged less than turnkey pricing under a theory of quasi estoppel.   The doctrine of quasi estoppel "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App. 2010) (quoting *Lopez v. Munoz, Kockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000).   In other words, "quasi estoppel forbids a party from accepting the benefits of a transaction . . . and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex.App.-Corpus Christi 1994, writ denied).   "[U]nlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance" *Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App. 2008).   "However, there 'can be no ratification or estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts.'" *Clark*, 327 S.W.3d at 770 (quoting *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex.1971); *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 292 (Tex.App. 1998).

As explained above, there is sufficient evidence indicating that Obermeyer *should have known* that it was being charged turnkey pricing as of January 11, 2013.   However, CSI has not

pointed to any cases where a court applying Texas law found constructive knowledge sufficient to apply the doctrine, nor has this Court found any upon its own search.   CSI's argument is therefore rejected.

### C. The Parties' Remaining Claims

Having determined that the parties had formed a binding contract that included the billing of calendered Fabric at Turnkey pricing, the allegations underlying Obermeyer's claims for breach of contract, promissory estoppel, money had and received, and unjust enrichment fail on essentially the same grounds.   Based on the above analysis, summary judgment may be entered in CSI's favor as to all of these claims.   Likewise, because CSI's breach of contract claim is based on essentially the same premise as its unjust enrichment claim (and is pled in the alternative), the Court's above analysis applies equally to both of these claims and summary judgment may be entered in CSI's favor as to both.

## IV.   CONCLUSION

Based on the foregoing, it is ORDERED that:

1. Defendant CSI Calendering, Inc.'s Motion for Summary Judgment (ECF No. 47) is GRANTED, to wit,

    a.  summary judgment is granted in Defendant CSI Calendering, Inc's favor as to liability with respect to Plaintiff Obermeyer Hydro Accessories' claims for breach of contract, promissory estoppel, money had and received, and unjust enrichment; and

    b.  summary judgment is granted in Defendant CSI Calendering, Inc's favor as to

liability with respect to its breach of contract counterclaim and its alternative unjust enrichment counterclaim.

2.  Plaintiff Obermeyer Hydro Accessories, Inc.'s Cross-Motion for Partial Summary Judgment (Liability) (ECF No. 59) is DENIED.

The sole issue remaining before this Court is that of damages.   As the Court ordered at the status conference held in this matter on January 22, 2016, (ECF No. 97), the parties are directed to file a joint status report on the issue of damages one week from the filing of the present order.

DATED this 27th day of January, 2016.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge